**UNITED STATES of America**

v.

**Joe Harry PEGG.**

**No. 94–38–CR–FTM–17D.**

United States District Court,
M.D. Florida,
Fort Myers Division.

April 28, 1999.

---

John Murray Fitzgibbons, Law Office of John M. Fitzgibbons, Tampa, FL, Michael S. Pasano, Zuckerman, Spaeder, Taylor & Evans, Miami, FL, William F. Jung, Black & Jung, P.A., Tampa, FL, James E. Sharp, Sharp & Langford, Washington, DC, William J. Gengo, Virginia F. Flack, Law Office of William J. Jengo, Santa Monica, CA, for Defendant.

Cynthia Hawkins Collazo, Paul G. Byron, U.S. Atty's Office, Middle District of Florida, Orlando, FL, for U.S.

### ORDER

KOVACHEVICH, Chief Judge.

Before the Court is the defendant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 348) filed on February 2, 1997. The government filed a response (Doc. 357) on April 4, 1997. As grounds for his motion the defendant alleges that: 1) his counsel was ineffective based on a conflict of interest arising out of his counsel's own self-interest and concerns, and 2) the Court abused its discretion in denying the defendant's motion to withdraw his guilty plea. An evidentiary hearing has been held on the defendant's claims. Because the evidence does not support the claims, the defendant's motion will be **DENIED**.

### I. FACTS

#### A. Background

In November of 1988, the defendant arranged to have a ship, the *Turtola*, leave Colombia with approximately 20,000 pounds of marijuana. The *Turtola* was to transport the marijuana to the Florida Keys. Bernie Getchman, one of the co-defendants in this case, was responsible for the off-load of the marijuana into the Florida Keys, where the marijuana would be trans-shipped for a later sale. Only approximately 5,000 pounds of the marijuana was successfully imported to the United States and ultimately sold.

Sometime in early 1989, the defendant made arrangements for another shipment from Colombia to the Florida Keys aboard the *Turtola*. This time a co-conspirator named Reggie Baxter was responsible for the off-load and importation of the marijuana into the United States. Once in the Florida Keys, the marijuana aboard the *Turtola* was to be transported to several boats launched from the area of Marco Island, Florida. However, the *Turtola* was intercepted by the United States Coast Guard and only one of the boats succeeded in taking approximately 5,000 pounds of marijuana. The rest of the marijuana aboard the *Turtola* was seized by the Coast Guard. R.Doc. 179, pp. 15–16.[1]

In May, 1990, Baxter was indicted for his involvement in the marijuana importation aboard the *Turtola*. In February, 1991, Baxter pled guilty to the marijuana importation and agreed to cooperate with the government.

On March 29, 1994, the grand jury returned a two count sealed indictment against the defendant and others, including Getchman. The first count charged the defendant with conspiracy to import marijuana in November, 1988. The second count charged the defendant with conspiracy to import marijuana in April, 1989. On June 10, 1994, the indictment was unsealed and the defendant was arrested at his home that morning. R.Doc. 363, p. 5.

After the defendant was transported to the Middle District of Florida, James E. Sharp and Vernon Thomas Lankford, of the Washington, D.C. firm of Sharp and

---

1. Citations to the record will be as follows: R. Doc. [Docket Number].

Lankford, entered an appearance in this case as the defendant's counsel. *Id.* Sharp is a nationally renowned criminal trial lawyer, a former federal prosecutor, and a member of the American College of Trial Lawyers. R.Doc. 405, p. 38. Sharp's attorney-client relationship with the defendant began in 1981, when Sharp represented the defendant in related state and federal marijuana prosecutions. R.Doc. 404, pp. 101–108. At the time Sharp and Lankford entered an appearance in this case, Sharp was also representing the defendant and other members of the defendant's family in a civil forfeiture matter in the Eastern District of Louisiana. R.Doc. 397, p. 172.

On August 8, 1994, John M. Fitzgibbons filed a notice of appearance in the case as local counsel. R.Doc. 95. Fitzgibbons, a well-known Tampa criminal attorney with 24 years of experience, and a Board Certified Criminal Trial attorney, had started his own practice in 1987. Before going into private practice, Fitzgibbons served as a state and federal prosecutor, a special counsel to the House of Representatives Small Business Committee, and in the Public Integrity Section of the Justice Department. R.Doc. 404, pp. 4–8. Originally, Fitzgibbons's role in the defendant's case was limited to that of local counsel. Fitzgibbons was not expected to actively participate in the defense or in the trial. R.Doc. 404, p. 15.

In a letter dated September 2, 1994, counsel for the government, Assistant U.S. Attorney Cynthia Hawkins (later Cynthia Hawkins Collazo) solicited Sharp's position with regard to a potential conflict of interest based on Sharp's contact with Baxter, who would testify at trial against the defendant. Sharp's partner, Lankford, telephoned Collazo in response to the letter and denied the existence of any conflict of interest. R.Doc. 398, p. 135 & R.Doc. 404, p. 117.

On October 11, 1994, the defendant's trial was continued from October 17, 1994, to November 28, 1994. Sometime in September or October, 1994, Collazo advised Sharp that, unless the defendant entered a guilty plea, the government would file a motion to disqualify Sharp based on the alleged conflict of interest. Sharp responded that if the Court granted the motion for disqualification, Fitzgibbons could try the case. R.Doc. 404, pp. 217–18, 269. A week or two before the trial, Sharp and Lankford asked Fitzgibbons to travel to Washington D.C. to meet with them. R.Doc. 404, pp. 15–16. When he arrived in Washington, Fitzgibbons met with several attorneys. Fitzgibbons remembered that the conflict issue was discussed and that at some point he was told that he might have to step in and try the case as first chair. R.Doc. 404, p. 17.

Approximately two weeks before the trial date, Sharp informed Collazo that the defendant would proceed to trial. On November 18, 1994, the government faxed a copy of the proposed "Government's Motion to Disqualify Counsel for the Defendant Pegg." In the motion, the government argued that the evidence would show that Sharp had a prior relationship with Baxter and that Sharp was involved in unethical and criminal conduct related to the charges for which the defendant was to stand trial. The government's motion also implicated attorney Richard Hibey in the wrongdoings. Hibey, a well-known Washington D.C. attorney, had represented Baxter when Baxter was indicted and pled guilty to the 1989 marijuana importation. Hibey was a close personal friend of Sharp. R.Doc. 404, p. 122.

The government alleged in the disqualification motion that after Baxter's indictment, but before the defendant's indictment, the defendant arranged a meeting between Sharp and Baxter. In that meeting, Baxter allegedly discussed the facts of the April, 1989, importation with Sharp and Sharp arranged to meet with Baxter again in the future. The motion further stated that at a later date Sharp introduced Baxter to Hibey, and the three of them agreed that the defendant would pay for a portion of Baxter's legal fees. Bax-

ter was allegedly aware that Sharp and Hibey had further conversations regarding the extent of Baxter's cooperation with the government. In the motion, the government stated that Baxter would testify that Hibey had discussed with Baxter a version of the events to tell the government that was false and that Baxter would testify as to Sharp's role in concocting that story. R. Defendant's Evidentiary Hearing Exhibit 1.

The disqualification motion identified three separate grounds for disqualification of the firm of Sharp and Lankford from the defendant's representation:

1) Sharp had a conflict between his duty to the defendant and his duty to Baxter because Sharp entered into an attorney-client relationship with Baxter that involved privileged communications;

2) Sharp was subject to being called as a witness against the defendant due to his personal knowledge of the alleged arrangement concerning the defendant's payment of part of Baxter's legal fees;

3) "the integrity of the court" required Sharp's disqualification because Baxter would testify that Sharp was involved in concocting a false story to the Drug Enforcement Administration Agents to exculpate the defendant.

In the motion, the government argued that if the defendant proceeded to trial, Sharp's disqualification was mandatory and could not be waived by the defendant. The defendant argues that a fourth ground for disqualification, which is the basis for the instant motion to vacate, was created by the government's making the disqualification of Sharp and Lankford conditional upon the defendant's proceeding to trial. The defendant argues that making the disqualification contingent upon whether the defendant went to trial made it in the firm's best interest to avoid the publication of Sharp's alleged unethical and criminal conduct at trial by convincing the defendant to plead guilty. The Court notes that the disqualification motion was never filed with the Court.

**B. Evidentiary Hearing**

At the evidentiary hearing on the instant motion, Sharp vehemently denied Baxter's accusations of impropriety. According to Sharp's testimony at the evidentiary hearing, Sharp only met with Baxter once. At that meeting, Baxter started to relate to Sharp the facts of a marijuana importation. Baxter mentioned the defendant's name and at that point in the conversation Sharp stopped Baxter and told him "I don't even want to talk anymore. I certainly can't represent you." R.Doc. 404, p. 119. Baxter begged Sharp to take his case and Sharp refused. R.Doc. 404, p. 120. Baxter kept calling Sharp and asking him to represent him. Finally, Baxter asked Sharp if he could refer Baxter to another attorney. Sharp called Hibey and asked Hibey if he would agree to talk to Baxter. Hibey agreed to do it. Hibey then became Baxter's counsel. R.Doc. 404, p. 122.

The testimony presented at the hearing revealed that as soon as the firm of Sharp and Lankford received the copy of the disqualification motion, they started preparing a response. Paul Castellito, an associate at the firm, was the attorney assigned to draft the response to the disqualification motion. R.Doc. 397, p. 92 & R.Doc. 404, p. 125. The response to the motion was never filed with the Court.

Paul Knight, an attorney at the firm of Sharp and Lankford at the time, testified at the hearing that Sharp was overly concerned with regard to the disqualification motion, and that the disqualification issues became Sharp's primary focus and concern in the days before trial. R.Doc. 397, pp. 176 & 225–228. Further, Castellito testified that Sharp was concerned about the allegations of improper conduct and their effect on him personally. R.Doc. 397, p. 93. In his testimony, Sharp admitted that he was concerned about the government's allegations of impropriety. However, Sharp stated that he always placed the defendant's interests first. During his testimony, Sharp said "[i]f you begin with yourself, you are doing it wrong. If you

begin with the impact on [the client], you're doing it right." R.Doc. 404, p. 236. Sharp further stated "I was concerned about myself. I don't want to discount that at all ... But also, make no mistake about it, I was not going to sell [my client] out for myself." R.Doc. 404, p. 273.[2]

On November 28, 1994, the day the defendant's case was scheduled for trial, Bernie Getchman entered a guilty plea and identified the defendant, Joe Pegg, as one of his co-conspirators. R.Doc. 263, p. 12 & R.Doc. 404, p. 136. After Getchman entered his guilty plea, Sharp asked the Court for a moment to speak with co-counsel. Sharp testified that he believed that Getchman's testimony could tilt the balance against the defendant. R.Doc. 404, p. 138. Getchman pled guilty to the charges in the indictment without the benefit of a plea agreement. Sharp believed that because Getchman did not have a plea agreement, there was a good possibility that after the plea Collazo would offer Getchman a reduced sentence in return for Getchman's testimony against the defendant. R.Doc. 404, p. 137.

Sharp consulted with Fitzgibbons and the other attorneys from his firm that were present at the time. Fitzgibbons testified that, at that point, it became "pretty clear fairly quickly that Judge Kovachevich [the undersigned] would be the sentencing judge." R.Doc. 405, pp. 40–41. Fitzgibbons advised Sharp that if the defendant pled guilty and this Court were to impose the defendant's sentence, if the defendant agreed to cooperate with the government, this Court would reward the defendant's cooperation. Fitzgibbons told Sharp that this Court was known to reward and give lenient sentences to cooperators. R.Doc. 404, pp. 29–30 & 140. Sharp believed that by pleading guilty, the defendant could avoid the Getchman problem and perhaps get a favorable venue for his sentencing. R.Doc. 404, p. 141. After consulting with Fitzgibbons, Sharp informed the trial judge, Honorable Lee P. Gagliardi, that he believed the parties could resolve the case without going to trial and requested a ten-day continuance. Judge Gagliardi denied the request for a ten-day continuance and gave the parties 24 hours to resolve the issue of whether the defendant would plea or would proceed to trial.

At the time Sharp informed Judge Gagliardi that he believed the case could be resolved without a trial, the defendant's plea agreement had not been drafted and Sharp had not discussed the possibility of a plea with the government in at least two weeks. R.Doc. 397, p. 181 & Doc. R. 404, pp. 195–96.

The government provided the defendant with a proposed plea agreement sometime during the day on November 28, 1994. Under the terms of the agreement, the defendant was required to cooperate with the government and to forfeit $8 million. The forfeiture amount was reduced to $4 million during the plea negotiations. Pursuant to the plea agreement, in return for the defendant's cooperation and forfeiture, the government would dismiss one of the counts of the indictment, would not file second offender papers, and would recommend a reduction in the defendant's sentencing score sheet for acceptance of responsibility. If the defendant failed to provide the government substantial assistance, his guideline sentence range would be 360 months to life imprisonment. R.Doc. p. 179.

The defendant agonized over whether he should plead guilty or go to trial. Before signing the plea agreement, the defendant had extensive meetings with his attorneys. During those meetings, the defendant voiced his concern with regard to the forfeiture amount. The defendant asked Sharp "Where are we going to get that money?" R.Doc. 404, p. 146. However,

2. To the extent that Sharp's testimony might be contrary to Knight's and Castellito's version of the events, the Court accepts Sharp's testimony as correct. In making this credibility determination, the Court relies on the demeanor of the witnesses and on their relative forthrightness in responding to questions.

even though money was an issue, Sharp testified that he assumed the defendant's brother William (Bucky) Pegg would come up with the money. Sharp stated "I think that was a realistic assumption." R.Doc. 404, p. 254. Before proceeding to explain his belief that Bucky Pegg could provide the forfeiture money was a realistic, Sharp asked the defendant's counsel whether that information was within the scope of the attorney-client privilege that had not been waived by the defendant. Without responding to Sharp's inquiry, the defendant's counsel withdrew the question.[3] *Id.* Sharp then stated, "I was sure [the defendant and his brother] could come up with [the money]." R. 404, 255.

Also, during the meetings the attorneys discussed with the defendant the issues raised by the government's disqualification motion and the different conflicts of interest raised in the motion. Fitzgibbons testified that the conflict issue was discussed by the lawyers in front of the defendant on several occasions. R.Doc. 405, p. 6. However, the defendant was adamant that he wanted Sharp to represent him. R.Doc. 404, p. 287. Sharp and Fitzgibbons testified that they did not advise the defendant of his right to consult an independent counsel on the conflict issue because they believed that the defendant would refuse to do it. R.Doc. 404, pp. 287–88, 290 & R.Doc. 405, pp. 43–44.

Sharp testified that at one point he considered that it could be better to address Baxter's allegations in court and deny them. However, before making the final determination Sharp had to take into account the impact that Sharp's testimony, if he was required to testify, would have on the defendant's case. Sharp stated that if he were to take the stand to contradict Baxter's allegations, there was a strong possibility that Sharp would have to testify regarding the contents of his first conversation with Baxter and that in that conversation Baxter implicated the defendant in the 1989 importation. Accordingly, Sharp believed that his testimony at trial could severely hurt the defendant's case. R.Doc. 404, p. 202.

Finally, after much deliberation, the defendant signed the plea agreement sometime late on November 28, 1994. Sometime before the defendant pled guilty, Collazo had made it clear that neither Sharp nor Hibey was the target of a government investigation. It is not clear from the record whether Collazo informed Sharp personally or someone else conveyed the information to Sharp. Sharp did not remember whether it was Collazo or Hibey who had told him that he was not a target. R.Doc. 404, pp. 124 & 226–8. Also, the record is not clear as to whether Sharp learned that he was not a target on or before November 28, 1994, date in which the trial was scheduled to begin.

On November 29, 1994, the defendant pled guilty pursuant to the plea agreement. At the plea hearing Judge Gagliardi inquired regarding the conflict issues. Specifically, the inquiry consisted of the following:

> THE COURT: Some issue has arisen as to whether or not there may be a conflict in [defense counsel's] representation of you. You are familiar of that, are you not?
>
> THE DEFENDANT: Pretty much so. I understand the situation, but I am happy with my counsel.
>
> THE COURT: You are happy, you are content, in light of the fact that there may be a problem with respect to their representation of you in this matter?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You are content to have them represent you?
>
> THE DEFENDANT: Yes, I do.

---

**3.** At all times during the evidentiary hearing, the defendant's attorneys tried to avoid any

inquiries directed to the defendant's finances.

THE COURT: Do you waive any conflict of interest they may have in connection with this matter?

THE DEFENDANT: Yes.

THE COURT: All right . . .

R.Doc. 345, pp. 3–4.

Fitzgibbons testified that when the defendant pled guilty he was satisfied with the defendant's understanding of the conflict of interest issues. Fitzgibbons stated that ethically he had no doubt in his mind that, when the defendant was questioned by Judge Gagliardi on the conflict issue, the defendant understood the conflict. R.Doc. 405, p. 7. Further, Fitzgibbons testified that, when the defendant entered his guilty plea, Fitzgibbons believed it was in the defendant's best interest to do so. Fitzgibbons stated

I was comfortable that [the defendant] wanted to [enter the plea] that day. I never would have stood before a Federal Judge and said the things I said if I felt somebody had coerced [the defendant] or forced [the defendant] to do it. I would not do it. I wouldn't have signed my name to the plea agreement.

R.Doc. 405, pp. 42–43. Fitzgibbons further testified,

I felt as a lawyer that the [conflict] issue had been presented to the client in a fair way; that the ups and downs, the pros and cons were all laid out for the client; the risks, the strategic decisions, all of this, this was aired thoroughly. And when it came time for the plea, that the decision that [the defendant] made was a decision he felt comfortable with.

R.Doc. 405, p. 44.[4]

After the defendant entered his guilty plea, he informed his lawyers, including Fitzgibbons, on several occasions that he wanted to withdraw his plea. However, Fitzgibbons believed that the defendant was just in an internal turmoil and was going back and forth as to what he wanted to do. R.Doc. 405, p. 12. Fitzgibbons testified that the discussions never reached

the point where the defendant instructed his lawyers unequivocally that he wanted to withdraw his plea. R.Doc. 405, p. 13. Fitzgibbons stated "if he gave me an instruction to withdraw the plea, of course I would have filed something, or had the Washington lawyers file something." *Id.*

The defendant's sentencing date was continued on two occasions. On February 16, 1996, the date of the defendant's sentencing, Fitzgibbons moved for a third continuance. At a side bar conference, Fitzgibbons explained to the court that the defendant needed more time to cooperate with the government and to comply with the terms of the plea agreement. Further, Fitzgibbons expressed that the defendant was placed in an untenable situation before he pled guilty because of the accusations against his attorneys. However, Fitzgibbons told the Court that when the defendant pled guilty the defendant's attorneys:

[F]elt under the circumstances there was a good chance [the defendant] was going to cooperate, and the money would come in. I think we are close from talking to everybody in this thing except for Southern Florida right now, I haven't dealt with them, but I think we're close on getting the money. My guy wants it to happen, otherwise you are going to have to sentence him to 30 years to life and he's done.

R.Doc. S–44, p. 11. The Court denied the continuance and proceeded with the sentencing. The Court asked the defendant if he had discussed the presentence report with his lawyer. The defendant stated that he had not. Fitzgibbons stated that he had discussed the presentence report with the defendant about six months before the sentencing and asked for a moment to confer with his client. After conferring with the defendant, Fitzgibbons moved to withdraw the defendant's guilty plea. The Court denied the motion to withdraw. R.Doc. 342, pp. 2–7. The defendant did not appeal the Court's denial

---

4. To the extent Fitzgibbons's testimony may be contradicted by the testimony of other witnesses, the Court accepts Fitzgibbons's version of the events as true.

of his motion to withdraw. At the evidentiary hearing, Fitzgibbons testified that he did not believe, based on his professional experience, that an appeal of the motion to withdraw would succeed because Fitzgibbons did not feel the Court had abused its discretion in denying the motion. R.Doc. 405, p. 47.

## II. CONFLICT OF INTEREST

### A. Rules of Law

 The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel. The right to assistance of counsel includes the right to conflict free representation. A counsel's duty of loyalty to his client includes "a duty to avoid conflicts of interest," which the Supreme Court considers "perhaps the most basic of counsel's duties." *Strickland v. Washington,* 466 U.S. 668, 690, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The right to conflict free counsel applies to plea proceedings as well as trials. *Hill v. Lockhart,* 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

### 1. Conflict of interest standard

 "[T]o establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). When the defendant shows that an actual conflict adversely affected his counsel's performance, prejudice is presumed and the defendant is entitled to relief. *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

 In cases like the one now before the Court, where the alleged conflict of interest involves the attorney's self-interest, an actual conflict exists when:

1) the attorney has engaged or has been accused of engaging "in wrongful conduct related to the charge for which the defendant is on trial." *United States v. Fulton,* 5 F.3d 605, 610 (2d Cir.1993). The *Fulton* court held that when this happens

[I]t creates one of two actual conflicts. First, if the allegations are true ... the attorney may feel that a spirited defense could uncover convincing evidence of then attorney's guilt or provoke the government into action against the attorney. Moreover, the attorney is not in a position to give unbiased advice to the client as to such matters as to whether or not to testify or to plead guilty and cooperate since such testimony or cooperation from the defendant may unearth evidence against the attorney ... Second, even if the attorney is demonstrably innocent and the government's witness's allegations are plainly false, the defense is impaired because vital cross-examination becomes unavailable to the defendant.

*Id.* (citations omitted); or

2) "a lawyer's own personal interest would be compromised by pursuing a particular defense theory." *Freund v. Butterworth,* 165 F.3d 839, 886 (11th Cir.1999) (Tjoflat, J., dissenting), citing *United States v. McLain,* 823 F.2d 1457, 1463–64 (11th Cir.1987).

 A defendant who demonstrates the existence of an actual conflict must then show that the conflict had an adverse effect on the defendant's counsel's representation. Pursuant to *Freund v. Butterworth,* to prove adverse effect a defendant must satisfy three elements:

First, he must point to "some plausible alternative defense strategy or tactic [that] might have been pursued." *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985); *see also,Porter [v. Wainwright,* 805 F.2d 930, 939–40 (11th Cir. 1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987) ]. Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, *see, Strickland,* 466 U.S. at 692, 104 S.Ct. 2052, 80 L.Ed.2d 674, the petitioner "need not show that the de-

fense would necessarily have been successful if [the alternative strategy or tactic] had been used," rather he only need prove that the alternative "possessed sufficient substance to be a viable alternative." *Fahey,* 769 F.2d at 836. Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*Freund v. Butterworth,* 165 F.3d at 860. The *Freund* Court underlined that "[p]rejudice is presumed only if the defendant demonstrates that . . . 'an actual conflict of interest adversely affected his lawyer performance.'" *Id.* The Court finds that the Freund test applies to the defendant's claim.

### 2. Waiver

██ A criminal defendant can waive his right to conflict free counsel. *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975). Before allowing a defendant to relinquish his right to conflict free representation certain procedures must be followed:

> The district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most importantly the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives the Sixth Amendment protections. It is of course, vital that

the waiver be established by "clear, unequivocal, and unambiguous language." *Id.* at 278 (citations omitted).

██ The government argues that the defendant waived his right to conflict free counsel during the plea colloquy before Judge Gagliardi. The government's allegations are not supported by the record. The colloquy between Judge Gagliardi and the defendant failed to establish by "clear, unequivocal, and unambiguous language" the nature and consequences of the defendant's waiver. Even though the Court has no doubt that the defendant understood the nature and consequences of the waiver, the Court reached that conclusion after hearing the testimony at the evidentiary hearing, not from the face of the colloquy. Further, the record shows that the defendant was never informed of his right to an independent counsel. Whether or not the defendant would have acceded to that representation is irrelevant. The Court finds that the defendant's waiver colloquy did not satisfy the *Garcia* requirements and therefore did not constitute a valid waiver. Accordingly, the Court will address the merits of the defendant's claim.

### B. Merits

██ The defendant's ·main contention is that the government's conditioning of Sharp's disqualification on whether or not the defendant pled guilty created a conflict of interest. The Court disagrees. The conflict of interest was not created by the government's conditioning Sharp's disqualification on whether or not the defendant pled guilty. The conflict of interest was created by Baxter's allegations of Sharp's unethical and criminal activity. The government's conditioning the disqualification on the guilty plea did not make the conflict any less or any more real.

The defendant contends that by the defendant pleading guilty, Sharp and his firm avoided the publication at trial of Baxter's allegations of improper conduct against Sharp. If, on the other hand, the defendant had proceeded to trial, Baxter would

have testified that Sharp and his good friend Hibey concocted a story that Baxter was supposed to tell to the Drug Enforcement Administration negating the defendant's involvement in the marijuana importation. Sharp's interest did not change by the government's conditioning the disqualification on the plea. However, the defendant has clearly established the existence of an actual conflict of interest based on Baxter's allegations. Baxter, a government witness, alleged that Sharp was involved in criminal conduct related to the crimes charged against the defendant in the indictment.

Pursuant to *Fulton*, if the allegations of the attorney's criminal acts are proved to be true, the defendant need not show that the conflict adversely affected the lawyer's performance. If the allegations are false, the defendant has the burden of proving an adverse effect. *Fulton*, 5 F.3d at 611. Because the Court accepts Sharp's uncontroverted testimony that Baxter's allegations were false, the defendant must show that the conflict had an adverse effect on Sharp's representation of the defendant. The defendant has failed to meet this burden.

As stated above, to prove adverse effect the defendant had to show: 1) a plausible alternative defense strategy that could have been pursued, 2) that the alternative strategy was reasonable under the circumstances, and 3) that the alternative strategy was inherently in conflict with or was not undertaken because of Sharp's other loyalties or interests. *Freund*, 165 F.3d at 860.

The record shows that proceeding to trial was a plausible and reasonable alternative to pleading guilty. However, the record does not support a finding that the defendant's proceeding to trial was inherently in conflict with, or was not undertaken due to, Sharp's loyalties or interests.

Proceeding to trial was not clearly in conflict with Sharp's interests. Sharp testified that part of him wanted to go to trial and clear the record with regard to the allegations. If the defendant had gone to trial, Sharp would have been able to take the stand and contradict Baxter's allegations against him.

The defendant's lawyers, especially Sharp, agonized in deciding whether to go to trial or to enter a guilty plea. Four important factors made Sharp decide to advise the defendant to plead guilty. First, by pleading guilty, the defendant would avoid the possibility of Getchman testifying against him. Second, Sharp could continue representing the defendant because he would not be compelled to testify at trial or cross-examine Baxter. Third, a guilty plea would also avoid the possibility of Sharp testifying against his own client. If Sharp testified, there was a strong possibility that he would have to testify as to the contents of his first conversation with Baxter, which implicated the defendant in the marijuana importation. Fourth, Sharp believed that the defendant could cooperate with the government and earn a reduced sentence based on substantial assistance.

Sharp testified that although he was concerned about the repercussions of Baxter's testimony on his career and reputation as a lawyer, he always placed the defendant's interests before his own. Further, Fitzgibbons's testimony supports Sharp's decision to advise the defendant to plead guilty. Fitzgibbons stated that at the time the defendant entered his guilty plea he believed it was in the defendant's best interest.

The defendant argues that pleading guilty was not a reasonable alternative to going to trial because the defendant was obligated under the plea agreement to forfeit $4 million dollars to the government. Nonetheless, Sharp testified that he believed the defendant and his brother Bucky Pegg could raise the money. The defendant did not present any evidence that would show that Sharp's belief was unreasonable.

Accordingly, the Court finds that Sharp's representation of the defendant was not adversely affected by Baxter's al-

legations. Therefore, the defendant is not entitled to relief on his claim of ineffective assistance of counsel.

## III. WITHDRAWAL OF GUILTY PLEA

### A. Rules of Law

 Pursuant to Rule 32(e), Fed. R.Crim.P., a defendant may withdraw his guilty plea before sentencing if the defendant shows there is a "just and fair reason" for the withdrawal. A defendant does not have an absolute right to withdraw his guilty plea prior to sentencing. *United States v. McCarty,* 99 F.3d 383, 385 (11th Cir.1996). In determining if the defendant has met his burden the court must consider whether: "(1) close assistance of counsel was available; (2) the plea was knowing and voluntary; (3) judicial resources would be conserved; and (4) the government would be prejudiced if the defendant were allowed to withdraw his plea." *United States v. Buckles,* 843 F.2d 469, 472 (11th Cir.1988), *cert. denied,* 490 U.S. 1099, 109 S.Ct. 2450, 104 L.Ed.2d 1005 (1989).

### B. Merits

 The government correctly asserts that the Court need not address the merits of the defendant's plea withdrawal claim because the claim is procedurally barred. "Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a § 2255 proceeding" *Mills v. United States,* 36 F.3d 1052, 1055 (11th Cir.1994), *cert. denied,* 514 U.S. 1112, 115 S.Ct. 1966, 131 L.Ed.2d 856 (1995); *see also Cross v. United States,* 893 F.2d 1287, 1289 (11th Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990) ("[i]n a section 2255 federal habeas motion, a movant may not raise claims that were not presented on direct appeal unless he can show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors."); *Greene v. United States,* 880 F.2d 1299, 1305 (11th Cir.

1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1322, 108 L.Ed.2d 498 (1990) ("[i]n general, a defendant must assert an available challenge to a sentence on direct appeal or be barred from raising the challenge in a section 2255 proceeding."). "When a defendant fails to pursue an available claim on direct appeal, it will not be considered in a motion for § 2255 relief unless he can establish cause for the default and actual prejudice resulting from the alleged error." *Mills,* 36 F.3d at 1055; *see also Greene,* 880 F.2d at 1305 ("[a] defendant can avoid this procedural bar only by showing both cause for the failure to raise the claim on direct appeal and actual prejudice arising from that failure."). Alternatively, under the fundamental miscarriage of justice exception, when a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant relief in the absence of a showing of cause for the procedural default. *Mills,* 36 F.3d at 1055.

 The defendant has failed to demonstrate cause or prejudice with regard to his failure to raise on direct appeal his claim that the Court abused its discretion in denying his motion to withdraw his guilty plea. Likewise, the defendant has not shown the applicability of the fundamental miscarriage of justice exception. The Court has reviewed the entire record and concludes that the defendant is unable to satisfy either of the exceptions to the procedural default bar; therefore, the defendant's failure to raise these claims on direct appeal constitutes a waiver and bars him from raising this claim now.

## IV. BUCKY PEGG'S PLEA AGREEMENT

Although not relevant to the Court's ruling in this case, the Court notes its outrage with the events leading to Bucky Pegg's plea agreement with the Middle District of Georgia. After the defendant entered his guilty plea on November 29, 1994, the defendant made efforts to satisfy his forfeiture obligation under the plea agreement. To make the $4 million forfei-

ture payment, the defendant had to arrange for money to be transferred into the United States from abroad. Because the defendant was incarcerated, he asked his brother, Bucky Pegg, to accomplish the transfer. At this juncture, Bucky Pegg's attorney, Jerome Froelich became involved. Froelich demanded complete immunity for Bucky Pegg for any criminal liability that could arise from the transfer of the funds. R.Doc. 363, p. 9, & R.Doc. 398, p. 10. After asking the United States Attorney's Office for the Middle District of Florida for an immunity agreement without success, Froelich directed his efforts to trying to obtain a global agreement which included several districts. In his efforts to negotiate a global agreement, Froelich contacted the United States Justice Department. The Justice Department then would communicate with the different districts involved and try to put the multi-district agreement together. R.Doc. 398, p. 12.

On February 1, 1996, after months of negotiations, the U.S. Attorney's Office for the Middle District of Florida, through a letter signed by Collazo, agreed to participate in a multi-district immunity agreement granting Bucky Pegg the immunity he requested. The multi-district agreement included the Middle District of Florida, the Northern District of Georgia, and the Middle District of Georgia. R.Doc. 363, Exhibit E.

On February 7, 1996, Collazo sent a letter to Froelich informing him that the Middle District of Florida could no longer participate in the multi-district immunity agreement. R.Doc. 363, Exhibit F. The reason the Middle District of Florida withdrew its participation in the immunity agreement was that the Southern District of Florida informed them that Bucky Pegg was the subject of an investigation and that the immunity agreement could prevent the Southern District of Florida from investigating and prosecuting Bucky Pegg. R.Doc. 398, pp. 167–8.

Because of Bucky Pegg's failed efforts to reach an immunity agreement involving the Middle District of Florida, Bucky Pegg directed his attention to the Middle District of Georgia, where he ultimately entered into a plea agreement on June 30, 1997. Pursuant to the plea agreement, Bucky Pegg received blanket immunity in exchange for the forfeiture of approximately $47 million in cash and $ 5 million in properties. R.Doc. 398, pp. 9–25.

Bob Sharp, the Deputy Chief of the Asset Forfeiture and Money Laundering Section of the Criminal Division, Department of Justice, testified that the Acting United States Attorney in the Middle District of Georgia ignored the directions of the Department of Justice. R.Doc. 405, p. 239. Mary Lee Warren, a Deputy Assistant United States Attorney, instructed the Middle District of Georgia not to go forward with the immunity agreement without her approval or the approval of someone else in the Department of Justice. The Middle District of Georgia blatantly ignored Warren's directives and entered into the plea agreement with Bucky Pegg. R.Doc. 405, p. 240. The Middle District of Georgia's actions, for all practical purposes, resulted in Bucky Pegg being permitted to buy his way out of imprisonment and sell out his brother in the process.

The Justice Department determined that it could not set aside the plea agreement. Accordingly, the funds of Bucky Pegg's forfeiture will go into the Treasury Department's Asset Forfeiture Fund. Even though there is nothing this Court can do to reverse the outrageous and improper events that took place in the Middle District of Georgia, the Court wants to voice its repulsion over the Bucky Pegg plea agreement.

For the foregoing reasons, the defendant's motion to vacate, set aside or correct his sentence (Doc. 348) is **DENIED.** The Clerk is instructed to close the civil file.